# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

─────────────

m 00-50436

─────────────

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

CYNTHIA L. MARTINEZ,
also known as Cynthia Lyda,
also known as Cynthia Lynn Hedum,

Defendant-Appellant.

─────────────────────

Appeal from the United States District Court
for the Western District of Texas

─────────────────────

November 28, 2001

Before JONES, SMITH and DEMOSS,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Cynthia Lyda, formerly Cynthia Martinez, appeals a sentence of thirty-two years' imprisonment under the Assimilative Crimes Act, 18 U.S.C. § 13 ("ACA"), which requires the district court to impose a punishment "like" the ten-year maximum imposed under Texas's concurrent sentencing requirements.[1] We agree that, under the facts of this case, a federal sentence more than three times the length of the sentence Lyda would have received under state law is not "like" the state punishment. We vacate the judgment of sentence and remand for resentencing to a term of no greater than ten years.

─────────────────────

[1] There is federal jurisdiction for these crimes because they were committed at Lackland Air Force Base, a federal facility.

## I.

Lyda suffers from a psychiatric disorder known as Munchausen's Syndrome by Proxy, as a consequence of which she has induced or aggravated serious medical conditions in three of her childrenSSAaron, Daniel, and Joseph. This abuse caused Aaron's death, Daniel's catastrophic brain damage, and Joseph's hospitalization.

On the recommendation of Joseph's treating physicians, the FBI began videotape surveillance of Joseph's hospital room. Those tapes revealed Lyda's mistreatment of Joseph, which led to this indictment, plea, and sentence.

The sentencing court considered Lyda's abuse of all three children when departing upward for Lyda's criminal history and extreme conduct. Aaron, Daniel, and Joseph had a common pattern of development:

Aaron was born prematurely in 1988. As he grew older, Lyda reported an increasing number of apnea and seizure episodes. Aaron lost weight and suffered from chronic vomiting and diarrhea; doctors surgically inserted a gastric tube to feed him. After extensive testing, doctors were unable to reach a definitive diagnosis, although they considered various mitochondrial disorders; the hospital released Aaron. In March 1990, Lyda called her husband, David Martinez, at work and reported that Aaron had stopped breathing. When Martinez arrived, Aaron lay flat on his back, wearing only a diaper, and Lyda sat crying by his body. Martinez began CPR, but the doctors reported that Aaron was brain dead, and the parents ultimately decided to turn off the ventilator and allow him to die.

After the parents' divorce in 1995, Martinez learned that Lyda had purchased several bottles of Ipecac, which induces vomiting. After exhuming Aaron's body, a forensic toxicologist analyzed Aaron's hair and found proof of Ipecac poisoning. The treating physician, Dr. Saunder M. Bernes, testified that he believed Aaron's death was a homicide, and the large fluctuations in his physical health were more consistent with poisoning than with a degenerative disease.

After Daniel's premature birth, he experienced a similar pattern of health problems: mild developmental delay, seizures, apnea, vomiting, feeding intolerance, and gastrointestinal bleeding. Doctors were unable to isolate the cause of these symptoms. The treating physicians responded, progressively, by inserting an NG tube into the stomach, wrapping the top of the stomach to keep food from coming out (fundoduplication), and eventually performing a tracheostomy and a colonoscopy. During Daniel's final hospitalization in August of 1993, Lyda was the only other person in the room during his cardiac arrest. She failed to alert medical personnel until Daniel had reached an advanced stage of cardiac arrest. The arrest reduced him to a vegetative state, and he currently functions at the level of a one- or two-month-old.

Lyda gave birth to Joseph seven months after Daniel's cardiac arrest. After Joseph's premature birth, he failed to gain weight, despite clinical tests showing that he ingested food normally. The failure to gain weight persisted until he reached the age of five and one-half months, when his treating physicians hospitalized him. Over the course of several months, doctors failed to diagnose his illness, and the government's expert ruled out a mitochondrial disorder (although a defense expert testified

that all three children suffered from a mitochondrial disorder).

The surgeons performed a gastrostomy, a fundodoplication, and a tracheostomy and inserted a central line. Joseph had difficulty receiving nutrition through the tube, however, because his stomach bloated at night. In mid-November, he suffered from "polymicrobial sepsis," or the presence of mixed numbers of bacteria in his bloodstream. Four different types of fecal bacteria polluted the bloodstream, and, at sentencing, experts agreed that only the introduction of feces into the intravenous line could have caused this unusually severe sepsis.

After the sepsis, four treating physicians discussed their suspicions that Lyda had caused Joseph's illness. The doctors reported their suspicions to the Office of Special Investigations, and the FBI placed a video camera in Joseph's hospital room. The tape shows five types of abuse: (1) On November 24 and 25, the tape showed Lyda pouring a substance, presumably water, into Joseph's feeding bag. This would dilute the formula, causing the medical staff to believe that formula was not effectively promoting growth and forcing the doctors to perform more drastic medical procedures. (2) On December 2, 1994, Lyda blew into Joseph's G tube six times, which caused distention and discomfort and forced the doctors to discontinue feedings. (3) Also on December 2, Lyda placed objects into the G tube and feeding apparatus, which blocked the food from draining into Joseph's stomach. (4) That same day, Lyda placed her fingers over Joseph's trachea site, suffocating him for sixty-two seconds. This suffocation threatened to spark a long apneic episode with significant effects. (5) Finally, two tapes reveal Lyda's

pinching and squeezing Joseph severely and causing him visible pain. A nurse's report describes Joseph's discomfort, and a treating physician testified that pain can induce apnea.

A government forensic toxicologist, Dr. Alphonse Poklis, reviewed the medical records of all three children and determined that Ipecac poisoning had caused their symptoms. A government expert in mitochondrial disease, Dr. Richard Haas, testified that even if a mitochondrial disorder had caused some of their symptoms, Ipecac poisoning was responsible for some symptoms. Haas also testified that another human being caused their anoxia (lack of oxygen). After separation from Lyda, Joseph's physical symptoms disappeared, which some experts testified is more consistent with Ipecac poisoning than with a mitochondrial disorder.

II.

Lyda pleaded guilty to four counts of injury to a child and endangering a child as defined by Texas Penal Code §§ 22.04 and 22.041 and incorporated by the ACA. The plea agreement stipulated that Lyda's sentence "will be imposed in conformity with the *Federal Sentencing Guidelines and Policy Statements*, which may be up to the maximum allowed by statute for her offense."

The district court initially calculated a total offense level of 29 and a criminal history category of I, which yielded an imprisonment range of 87-108 months and a supervised release period of 2-3 years. The court then made several upward departures:

(1) The court departed upward to increase her criminal history category from I to III to reflect uncharged criminal conduct toward Aaron, Daniel, and Joseph, U.S.S.G. Manual

§ 4A1.3 (2000). (2) The court departed upward by four levels for extreme conduct, U.S.S.G. § 5K2.8. (3) The court imposed consecutive rather than concurrent sentences, U.S.S.G. § 5G1.2(d). (4) The court departed upward by three levels for extreme psychological injury, U.S.S.G. § 5K2.3. (5) The court departed upward by three levels for use of a dangerous weapon, U.S.S.G. § 5K2.6.

### III.

We first must decide, as a threshold matter, whether Lyda has waived her right to appeal the imposition of consecutive sentences.[2] In her plea agreement, she waived the right to appeal any sentence within the guidelines range but reserved the right to appeal any departure from the guideline range. If we decide that imposing consecutive sentences is an enhancement under U.S.S.G. § 5G1.2(d), the terms of the plea agreement may bar an appeal; if we determine that imposing consecutive sentences is an upward departure, Lyda retains the right to appeal. Even if she waived her right to appeal under the guidelines, she may retain that right based on the guidelines' inconsistency with the ACA.

### A.

The plea agreement waives Lyda's right to appeal on all grounds other than departures, but it does not explicitly address consecutive or concurrent sentencing.[3] During re-arraignment, the court engaged Lyda in a discussion about the scope of the waiver. After explaining that "you cannot appeal your sentence on any ground and you cannot appeal any decision . . . concerning the guidelines applicable to your case," the court immediately added that "you may appeal the sentence if I depart from the guideline range."

The court did not describe the consecutive sentences as either an enhancement under § 5G1.2(d) or an upward departure.[4] This court has refused to assume that a court imposed consecutive sentences as an enhancement rather than a departure. *United States v. Candelario-Cajero*, 134 F.3d 1246, 1248-49 (5th Cir. 1998). Absent an explanation, we must presume that the district court imposed consecutive sentences as a departure. Further, the guidelines compelled the court to impose consecutive sentences as a departure, not an enhancement.

### B.

The guidelines explain the conditions under which a sentence should be imposed consecutively or concurrently:

(a) The sentence to be imposed on a count for which the statute (1) specifies

---

[2] Although Texas state law governs whether Lyda waived her statutory right to concurrent sentences, federal law determines whether she has preserved her right to appeal the sentence. *Cf. United States v. Wertman*, 485 F.2d 566, 567 (5th Cir. 1973) (per curiam) (holding the federal courts follow federal sentencing procedures when deciding cases under the Assimilative Crimes Act). Because federal procedural rules govern, they will determine whether any procedural errors have caused Lyda to sacrifice her right to appeal.

[3] The plea agreement states: "Defendant voluntarily and knowingly waives her right to appeal her conviction and the parties voluntarily and knowingly waive their rights to appeal the sentence on any ground . . . . However, this waiver of rights does not extend to the parties' rights to appeal any departure from the Guideline range found by the district court."

[4] The court found "it ha[d] the authority" to do so under the Texas laws incorporated by the Assimilative Crimes Act.

4

a term of imprisonment to be imposed and (2) requires that such term of imprisonment be imposed to run consecutively to any other term of imprisonment shall be determined by that statute and imposed independently.

(b) Except as otherwise required by law . . ., the sentence imposed on each other count shall be the total punishment as determined in accordance with Part D of Chapter Three, and Part C of this Chapter.

(c) If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law.

(d) If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law.

U.S.S.G. § 5G1.2.

Section 5G1.2(d) instructs a court to impose consecutive sentences as an enhancement only if the sentence derived from a single count cannot achieve the "total punishment." The decision to impose consecutive sentences up to the level of "total punishment" would be an enhancement. Imposing consecutive sentences above the level of "total punishment" would be an upward departure.[5]

Lyda argues that "total punishment" should be calculated based on the defendant's criminal history category and combined offense level. She claims that the court should ignore upward departures when considering whether to impose consecutive sentences under § 5G1.2(d). According to Lyda, the court's original range of 87 to 108 months' imprisonment should establish the "total punishment" under the guidelines.

The government argues that "total punishment" should include the upward departures for inadequate criminal history, psychological injury, using a weapon, and egregious conduct. Four upward departures raised the offense level to 39 and the criminal history category to III. This yields a guideline range of 324-405 months.

"Total punishment" should be calculated "from the Guidelines Sentencing Table by correlating the appropriate criminal history category . . . with the defendant's combined offense level." *United States v. King*, 981 F.2d 790, 797 (5th Cir. 1993). A close reading of the guidelines' text, structure, and commentary suggests that departures fall

<hr />

[5] U.S.S.G. § 5G1.2(d) (labeling concurrent sentences as the default); *Candelario-Cajerol,* 134 F.3d at 1229; *United States v. H.I.*, 83 F.3d 592, 593-94 (2d Cir. 1998) ("[T]he district court may abjure the concurrent sentence paradigm set forth in § 5G1.2 . . . . Its decision to do so constitutes an upward departure"); *United States v. Quinones*, 26 F.3d 213, 215-17 (1st Cir. 1994) (same). *Cf. United States v. Martinez*, 950 F.2d 222, 226 (5th Cir. 1991) (permitting court to reject § 5D1.2(d)'s consecutive sentence requirement by departing from the guidelines range).

outside of the guidelines range.

First, the guidelines provide an incomplete definition of "total punishment." Section 5G1.2(b) specifies that "the sentence imposed on each other count shall be the total punishment as determined in accordance with Part D of Chapter 3, and Part C of this Chapter." Chapter 3, Part D describes the grouping rules for multiple counts. Chapter 5, Part C describes the procedures for imposing a term of imprisonment. Neither chapter mentions departures.

Second, the official commentary to § 5G1.2 explains that "total punishment is determined by the adjusted combined offense level." Determining the offense level differs from determining the overall prison sentence; the offense level excludes offender characteristics and departures "on other grounds." U.S.S.G. pt. H & intro. cmt (offender characteristics); U.S.S.G. pt. K (policy statements about other grounds for departures). By defining total punishment with reference to the "combined offense level," the guidelines exclude the consideration of departures from "total punishment."

Finally, the general application principles for the guidelines distinguish between determining the guidelines range and the cumulative prison sentence. U.S.S.G. § 1B1.1(h)-(i). The courts do not consider the departures contained in Chapter 5, Parts H and K to determine the guidelines range; they consider departures only to establish the overall prison sentence. *Id.* These structural features have led courts to conclude that "Departures . . . are sentences imposed outside the Guidelines." *United States v. Joetzki*, 952 F.2d 1090, 1097 (9th Cir. 1991).

The government points to three cases in which courts casually have stated that upward departures should be included in the "total punishment" calculation.[6] Each of these cases mentions the issue only in passing, and none offers a reason for including upward departures in the "total punishment" calculation.

The text and structure of the guidelines leads us to conclude that U.S.S.G. §5G1.2's "total punishment" calculation excludes departures. The district court imposed consecutive sentences as an upward departure, so Lyda retains the right to appeal.

IV.

When one commits non-federal crimes on federal property within a state's territorial jurisdiction, the United States can prosecute him for violations of state law under the ACA. The act requires federal courts to find the defendant guilty of a "like offense" and to impose a "like punishment." 18 U.S.C. § 13.[7]

---

[6] *United States v. Hernandez Coplin*, 24 F.3d 312, 318 n.6 (1st Cir. 1994) (*dictum*); *United States v. Griggs*, 47 F.3d 827, 831-32 (6th Cir. 1995) (quoting *dictum* from *Hernandez Coplin*); *Kikumura v. United States*, 978 F. Supp. 563, 584 (D.N.J. 1997) (upholding consecutive sentences imposed up to level of "total punishment" that included upward departure).

[7] The relevant portion of the statute reads:

Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in Section 7 of this title, or on, above, or below any portion of the territorial sea of the United States not within the jurisdiction of any State, Commonwealth, territory, possession or district is guilty of any act or omission
(continued...)

6

Lyda pleaded guilty to violations of the ACA and the incorporated Texas Penal Code §§ 22.04 and 22.041, which prohibit injuring or endangering children. The district court then had an obligation to impose a "like punishment."

Lyda argues that the court violated that obligation by imposing a thirty-two-year consecutive sentence, when Texas law permitted only a ten-year concurrent sentence. Although this court has never directly addressed the question in the context of concurrent and consecutive sentencing, the best reading of our jurisprudence and cases from the other courts of appeals requires the district court to cap Lyda's sentence at ten years.

A.

We review a challenge to the application of the sentencing guidelines under the ACA *de novo*.[8] In a series of three cases, we have explained the ACA's requirement that district courts impose "like punishments."

In *United States v. Davis*, 845 F.2d 94, 95 (5th Cir. 1988), we considered whether district courts can impose a federally mandated special assessment for each count of misdemeanor theft prosecuted under Texas Penal Code § 32.03. We explained that the ACA "assimilat[es] the entire substantive criminal law of the state wherein the federal enclave is located, 'including the laws . . . governing the manner in which an offense is to be punished.'" *Id.* at 96 (internal citations omitted). The federal special assessment, by its own terms, applied to all federal statutes, including the ACA; the court emphasized, however, that the ACA's requirement that individuals be "subject to a like punishment" establishes an overriding exception to federal sentencing statutes. *Id.* at 96-97.

We described the appropriate inquiry as whether the defendant would face a penalty "like" the federal special assessment under Texas state law. *Id.* at 97. "Like" implies similarity, and courts should consider the facts of each case and relevant federal policy considerations when determining that similarity. *Id.* at 98-99. Federal courts had rejected state laws requiring minimum periods of incarceration before parole, because these laws might interfere with the functioning of the (now-defunct) federal parole system. *Id.* at 99.[9] We determined that special assessments did not implicate such weighty federal interests. *Id.* at 99.

Because Texas permitted similar, but less severe, assessments against criminal defendants, we decided to cap the federal

---

[7](...continued)

which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13.

[8] *United States v. Marmelejo*, 915 F.2d 981, 984 (5th Cir. 1990) (treating it as a question of statutory interpretation); *United States v. Teran*, 845 F.2d 94, 96-97 (5th Cir. 1988) (same).

[9] The other federal courts of appeals uniformly refuse to incorporate state laws determining parole eligibility. *See, e.g., United States v. Pierce*, 75 F.3d 173, 177 (4th Cir. 1996); *United States v. Smith*, 574 F.2d 988, 992 (9th Cir. 1978).

assessments at the level set by state law. *Id.* This compromise ensured similarity with state punishments while preserving the goals of the federal assessment statute. *Id.*[10] We expressly reserved the question whether a federal court can impose a stricter sentence than does state law.[11]

In *United States v. Marmolejo*, 915 F.2d 981, 981 (5th Cir. 1990), the defendant pleaded guilty to a charge of cashing bad checks and was sentenced to six months' imprisonment and a year of supervised release. We held that the ACA's "like" requirement limits the range of punishment to the minimum and maximum sentences provided by state law. *Id.* at 984. Within that range, the sentencing guidelines will determine the length of the prisoner's sentence. *Id.* Because Texas law provided for up to ten years' imprisonment and parole, we held that the federal sentence satisfied the ACA's "like" requirement. *Id.* at 984-85.

Finally, in *United States v. Teran*, 98 F.3d 831, 835 (5th Cir. 1996), we held that a state's maximum penalties cannot deprive a magistrate judge of jurisdiction under the ACA. A magistrate judge found the defendant guilty of driving while intoxicated on a military base. *Id.* at 833. State law classified the DWI

as a misdemeanor punishable by up to two years in prison; federal law gives magistrate judges jurisdiction only over offenses punishable by imprisonment for up to a year. *Id.* at 834. We held that the ACA did not require the assimilation of the maximum punishment under state law, because the prison terms did not differ significantly, and federal courts have a strong interest in the ability to classify criminal cases as felonies or misdemeanors. *Id.* at 834-35.

Federal courts of appeals unanimously agree that state sentencing ranges should set the minimum and maximum length for federal prison sentences.[12] The logical extension of

---

[10] The Fourth Circuit reached the opposite conclusion under the ACA when applying Maryland law, because Maryland did not permit state courts to impose special assessments. *United States v. King*, 824 F.2d 313, 315-16 (4th Cir. 1987).

[11] *Davis*, 845 F.2d at 99 n.4 ("[W]e intimate no opinion as to whether a federal court under the authority of the ACA may impose a stricter custodial sentence than that mandated by state law strictly on the basis of federal policy concerns.").

[12] Most circuits have addressed the question. *See United States v. Vaughan*, 682 F.2d 290, 294 (2d Cir. 1982) ("It is a well established principle that a state statute that fixes the length of a prison term should control the sentence imposed by federal courts under the Act."); *United States v. Queensborough*, 227 F.3d 149, 160 (3d Cir. 2000) ("Courts have interpreted 'like punishment' to mean that state law sets the minimum and maximum punishment while the federal sentencing guidelines should be used to determine the actual sentence within that range."), *cert. denied*, 531 U.S. 1131 (2001); *United States v. Young*, 916 F.2d 147, 150 (4th Cir. 1990) ("[T]he 'like punishment' requirement of the [ACA] mandates that federal court sentences for assimilated crimes must fall within the minimum and maximum terms established by state law, and that within this range of discretion federal judges should apply the Sentencing Guidelines to the extent possible."); *Marmolejo*, 915 F.2d at 984 ("The ACA therefore limits the range of punishment to the minimum and maximum sentences provided by state law."); *United States v. Davenport*, 131 F.3d 604, 610 (7th Cir. 1997) (same); *United States v. Norquay*, 905 F.2d 1157, 1161 (8th Cir. 1990) ("We interpret the Major Crimes Act to require only that (continued...)

this rule is that a federal court cannot triple the length of the state prison sentence, even if it does so through consecutive sentencing rather than by ignoring a state statutory maximum.

Although conceding that state law limits the maximum and minimum punishments available, the government offers countless reasons to distinguish concurrent sentencing laws from statutory minimums and maximumsSSthe ACA only requires "like" punishment,[13] the concurrent sentencing law is codified in the "Introductory Provisions" of the Texas Penal Code,[14] and the concurrent sentencing law

might be merely procedural.[15] The government fails, however, to explain why these distinctions should make a difference. A close look at the cases in other jurisdictions confirms that the ACA caps Lyda's prison sentence at ten years.

In an analogous case, the Second Circuit held that federal courts must apply state mandatory minimums for recidivist burglars. *Vaughan*, 682 F.2d at 292. The New York Penal Code had a separate provision increasing the sentence for the second violent felony conviction; the court held that the district court had correctly applied this mandatory minimum. *Id.* This suggests that federal courts should consider all provisions of state law that affect the length of the sentence.

Only the Ninth Circuit has squarely addressed the issue under the ACA. In *United States v. Leake*, 908 F.2d 550, 552 (9th Cir. 1990), the court considered whether California law limiting the length of consecutive sentences would bind a federal court applying the ACA.[16] The court declared the imposition of consecutive sentences consistent with state law, but it did consider state law binding. *Id.* By contrast, the court endorsed the traditional rule that federal courts can ignore state parole

---

[12](...continued)
the sentence imposed for burglary fall within the minimum, if any, and maximum sentence established by state law . . . . Within that range, the sentence should be calculated according to the Federal Sentencing Guidelines.") (citations omitted); *United States v. Leake*, 980 F.2d 550, 551 (9th Cir. 1990) (same); *United States v. Garcia*, 893 F.2d 250, 254 (10th Cir. 1989) (holding that the ACA "requires courts to impose sentences for assimilative crimes that fall within the maximum and minimum terms established by state law"); *United States v. Gaskell*, 134 F.3d 1039, 1045 (11th Cir. 1998) ("We leave intact the established rule that a term of incarceration under the ACA cannot exceed the limits set by assimilated state law.").

[13] This opinion and every court decision cited assumes this unremarkable legal standard.

[14] The Fourth Circuit has rejected the argument that the location of the law in the code should affect a court's willingness to apply it under the ACA. *United States v. Price*, 812 F.2d 174, 175-76 (4th Cir. 1987) (refusing to consider publication in code of criminal procedure).

[15] Tex. Penal Code § 3.03 causes a substantive change in the length of the defendants confinement, as in the instant case by the drastic effect on the sentence. The government fails to offer persuasive reasons to consider the statute procedural or a test for sorting substantive and procedural state sentencing laws.

[16] The Ninth Circuit has issued a subsequent opinion consistent with this, holding that state laws regulating sentence enhancements trump the guidelines in any conflict. *United States v. Hooka-no*, 957 F.2d 714, 716 (9th Cir. 1992).

9

eligibility requirements when handing out sentences under the ACA. *Id.*[17]

The Eighth Circuit has interpreted the Indian Major Crimes Act as requiring district courts to follow the sentencing guidelines, rather than state law, when choosing between consecutive and concurrent sentences. *Norquay*, 905 F.2d at 1162[18] The court held that the district court had erred by applying state law regulating concurrent versus consecutive sentences, instead of U.S.S.G. § 5G1.2. *Id.* at 1162. The court explained that the Major Crimes Act does not require the courts to follow "every last nuance of a sentence that would be imposed in state court." *Id.* (citing *Garcia*, 893 F.2d at 254, which interpreted the ACA). The court analogized consecutive sentencing laws to state regulations of parole eligibility, which federal courts routinely ignore under the ACA, *id.*, and explained its concern that application of state law regulating consecutive versus concurrent sentencing "would be disruptive to the federal prison system," *id.* at 1163.

The decision whether to assimilate the Texas concurrent sentencing law should turn on the relative persuasiveness of *Leake* and *Norquay*. In other words, it should hinge on whether, as the government asserts, § 5G1.2 protects an important federal interest of the type usually recognized under the ACA. There are two possible federal interests:

The *Norquay* court, 905 F.2d at 1162, cited the federal interest in controlling the prison system, but its rationale is unpersuasive for three reasons. First, the court considered concurrent sentencing requirements and good behavior credits for time served in the same section of its analysis. *Id.* at 1162-63. Good behavior credits obviously relate to the internal operations of the prison, but the overall length of the sentence is affected by a state's statutory maximums as well as its concurrent sentencing laws. The court conflated the discussion of two laws that have very different implications for the internal operations of a

---

[17] In an ambiguous decision, the Fourth Circuit used the sentencing guidelines to determine whether sentences under the ACA should run concurrently or consecutively. *United States v. Young*, 916 F.2d 147, 151, 152 (4th Cir. 1990). The court began by embracing the established rule that state law should define the maximum and minimum prison terms under the ACA. *Id.* at 150-51. The court vacated the sentences that exceeded state maximums and remanded and provided sentencing instructions in *dictum*. *Id.* The court directed the district court to use U.S.S.G. § 5G1.2(d) when determining whether to impose a consecutive or concurrent sentence. *Id.* at 152. Although the opinion does not mention the interaction between the sentencing guidelines and state laws regulating concurrent sentences, the decision suggests that federal district courts might apply, as a default rule, the guidelines' regulations for imposing consecutive sentences.

[18] The offense at issue was burglary, which federal law does not define or punish. *Norquay*, 905 F.2d at 1159. In those cases, the statute directed at the time:

> Any offense . . . not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

(continued...)

[18](...continued)
*Id.* at 1160 n.6 (quoting 18 U.S.C. § 1151).

federal prison.

Second, under the facts of *Norquay*, the defendant would have been forced to serve a federal sentence in state prison if they had run concurrently. *Id.* at 1163. The United States may have an interest in applying federal correctional policies when a prisoner serves a federal sentence. Finally, the court failed to explain how the application of state law on concurrent sentences would interfere with the operation of federal prisons. Without a convincing explanation, we will further the usual policies of the ACA.

In the instant case, the government argues that we should promote its interest in uniformly applying federal law. This argument has several flaws: First, as the Tenth Circuit noted, it is impossible to promote intrastate uniformity by applying state sentences while simultaneously preserving interstate uniformity. *Garcia*, 893 F.2d at 253-54. The ACA represents a deliberate choice to promote intrastate uniformity above interstate uniformity when a defendant commits a crime, otherwise punishable by state law, on federal land. *Id.*

Second, the government's proposed exception would swallow the rule created by the ACA. Congress passed the ACA to ensure that state laws, rather than federal laws, will determine the length of sentences when a conflict arises.[19] If the courts relaxed this rule whenever the sentences conflict, the ACA

would be practically eliminated.[20]

Texas law mandates concurrent sentences. Texas's choice to limit the length of all concurrent sentences deserves as much deference as does a choice to set the statutory maximum for an individual crime.[21] To give full effect to the ACA, we must cap Lyda's consecutive sentences at ten years.

### B.

The district court and the parties agree that Tex. Penal Code § 3.03 would require the sentences to run concurrently.[22] The controversy

---

[19] *See, e.g., United States v. Sharpnack*, 355 U.S. 286, 291 (1958); *United States v. Collazo*, 117 F.3d 793, 794 (5th Cir. 1995).

[20] The government argues that through the plea bargain, Lyda voluntarily waived the applicability of state sentencing law. The government does not cite any authority for the proposition that a criminal defendant has the power to waive the right to be tried under state law. Indeed, it would be odd if a plea bargain could materially alter the terms of a federal statute that chooses the applicable law in a manner designed to promote systemic interests.

[21] It is difficult to imagine Texas's setting its criminal penalties for individual sentences without regard to the concurrent/consecutive sentencing rules. A state that has lenient penalties for individual crimes but many similar individual crimes could increase average prison sentence length by using consecutive sentencing. A state that has stiff penalties for individual crimes and few overlapping crimes could eschew the consecutive sentencing and achieve the same average prison sentence length. Texas chose to adopt concurrent sentencing in the context of its sentences for individual crimes. Incorporating sentences for individual crimes while ignoring the concurrent/consecutive choice risks undoing the deliberate policy choices of the state legislature.

[22] Texas Penal Code § 3.03(a) provides in pertinent part:

(continued...)

11

centers on whether, by accepting the plea bargain, Lyda waived her statutory right to concurrent sentences. The district court and parties rely on *Ex Parte McJunkins*, 954 S.W.2d 39 (Tex. Crim. App. 1997), to define the elements of waiver.

In *McJunkins*, the defendant pleaded guilty to two informations charging him with murder with a deadly weapon and aggravated robbery; in exchange, the government recommended that he serve two consecutive sentences of life imprisonment. *Id.* The court classified the right to concurrent sentencing as an individual right that the defendant may waive, just as he can waive the right to separate jury trials. *Id.* at 41. The court emphasized that the plea agreement specified consecutive sentences. *Id.*

Lyda's written plea agreement did not mention consecutive sentences. At the plea colloquy, the court informed her that she potentially could face consecutive sentences. For

---

[22](...continued)
When the accused is found guilty of more than one offense arising out of the same criminal episode prosecuted in a single criminal action, a sentence for each offense for which he has been found guilty shall be pronounced. Except as provided by Subsection (b), the sentences shall run consecutively.

Texas Penal Code § 3.01 defines a "criminal episode," irrespective of the number of victims, as:

(1)[ ] offenses [ ] committed pursuant to the same transaction or pursuant to two or more transactions that are connected or constitute a common scheme or plan; or

(2) [ ] offenses [that] are the repeated commission of the same or similar offenses.

three reasons, Lyda's oral statement of understanding should not suffice to waive her statutory rights:

First, the *McJunkins* court specifically preserved *LaPorte v. State*, 840 S.W.2d 412, 414 (Tex. Crim. App. 1992), which had construed narrowly the waiver of the right to concurrent sentences after a jury trial. *McJunkins*, 954 S.W.2d at 41. Under the rule of *LaPorte*, a defendant, to preserve the issue for appeal, need not demand separate trials or object at trial to the improper cumulation of sentences; if the state chooses to consolidate the charges in a single trial, the defendant retains his statutory right to concurrent sentences, even if he does not raise the issue at trial. *Id.* Expressly carving out this exception suggests that the Court of Criminal Appeals will permit a defendant expressly to waive his right to appeal but will not imply such a waiver lightly.

Second, a Texas court of appeals recently refused to extend *McJunkins* to a passive waiver of the statutory right to concurrent sentences. In *Worthington v. State*, 38 S.W.3d 815, 819 (Tex. App.SSHouston [14th Dist.] 2001), *vacated on other grounds*, Nos. 0558-01, 0559-01, 2001 Tex. Crim. App. LEXIS 65 (Tex. Crim. App. Sept. 12, 2001), a trial court improperly cumulated burglary sentences. The state argued that by failing to object to the cumulation order at trial, the defendant had waived the right to concurrent sentences. *Id.* The court refused to interpret the failure to object as a knowing, voluntary, and intelligent waiver. *Id.* at 820. This decision suggests that passively responding during a plea colloquy is not proof enough of a knowing and intelligent waiver; Texas courts would require that the waiver appear in writing.

Third, the plea colloquy merely ensures that

the defendant understands the "maximum possible penalty" he faces under a plea.[23] Information about the maximum possible sentence should not bar the defendant from appealing upward departures. Indeed, during the colloquy, the prosecutor told the court that Lyda would have the right to appeal the thirty-two-year sentence.

## V.

Lyda does not appeal the upward departures for criminal history, U.S.S.G. § 4A.1.3, and extreme conduct, U.S.S.G. § 5K2.8, which increased her criminal history level to category III and her offense level to 33, yielding a guideline range of at least fourteen years' imprisonment. Because the ACA and Texas law cap her sentence at ten years, she cannot receive the minimum sentence under the guidelines.

The district court should use the upward departures for criminal history and egregious conduct to justify sentencing Lyda to the statutory maximum of ten years. We need not consider the validity of the upward departures for extreme psychological injury and use of a dangerous instrumentality, because the ACA prevents the court from further increasing the sentence.

The judgment of sentence is VACATED, and this matter is REMANDED for resentencing in accordance with this opinion.

---

[23] FED. R. CRIM. P. 11(c)(1); *see also United States v. Meyers*, 150 F.3d 459, 464 n.8 (5th Cir. 1998).