**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 24, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee/Cross-
    Appellant,

v.

LESLIE CHAPMAN,

    Defendant - Appellant/Cross-
    Appellee.

Nos. 15-2143 & 15-2173

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:14-CR-01065-JB-1)**
_____

Marc H. Robert, Assistant Federal Public Defender, Office of the Federal Public
Defender, Albuquerque, New Mexico, for Defendant-Appellant-Cross-Appellee.

Dean Tuckman, Assistant United States Attorney (Damon P. Martinez, United States
Attorney, and William J. Pflugrath, Assistant United States Attorney, on the briefs),
Office of the United States Attorney, Albuquerque, New Mexico for Plaintiff-Appellee-
Cross-Appellant.

_____

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **LUCERO**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

These direct criminal cross-appeals stem from a physical altercation between Defendant Leslie Chapman ("Chapman") and his then-wife, D.V. The altercation occurred in Veterans Administration ("VA") housing where the couple was staying while Chapman recuperated from surgery. As a result of the altercation, the United States charged Chapman, under the federal Assimilative Crimes Act ("ACA"), 18 U.S.C. § 13, with committing the New Mexico offense of aggravated assault on a household member, and a jury convicted him of that offense.

In appeal No. 15-2143, Chapman challenges the district court's decision to permit the Government's expert witness, Gail Starr, a certified sexual assault nurse examiner, to testify at trial that D.V.'s conduct in scratching herself across the chest after the altercation was consistent with conduct exhibited by sexual assault and domestic abuse victims to cope with the trauma they have experienced. The Government presented Starr's testimony to counter Chapman's argument that D.V. scratched herself instead to fabricate evidence against him. We conclude the district court did not abuse its discretion in admitting Starr's testimony.

In appeal No. 15-2173, the Government challenges Chapman's sentence. Under the ACA, a federal court is to impose a punishment "like" that available under state law. Consistent with this ACA directive, the district court properly imposed the statutory maximum term of probation and maximum fine available under New Mexico law, rather than the greater terms of probation and fines available under federal law. Having jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(b), therefore, we AFFIRM Chapman's conviction and sentence.

2

## I. BACKGROUND

Viewed in the light most favorable to the jury's verdict, see United States v. Jim, 786 F.3d 802, 804-05 (10th Cir.), cert. denied, 136 S. Ct. 348 (2015), the evidence presented at trial established the following: Chapman, now a civilian, had surgery to correct injuries to his nasal cavities suffered during his service in the Air Force. After the surgery, Chapman and D.V. stayed in VA housing in Albuquerque, New Mexico, for several days while Chapman recuperated before returning home to Abilene, Texas.

Three days after surgery, a physical altercation occurred between Chapman and D.V. Each accused the other of being the aggressor. According to Chapman, D.V. sucker-punched him with a closed fist to his surgically repaired face, punched him in the ribs, where surgeons had removed cartilage to implant into his nose, and then kicked him in the groin. D.V., on the other hand, testified that Chapman refused to allow her to leave their quarters by grabbing and holding her against her will. He also hit her several times. Although D.V. stated that she took a swing at Chapman to get away from him, he ducked and she did not land the punch.

After the altercation, Chapman had a scratch on his cheek. D.V. had a broken index finger on her right hand and a small cut on her right palm, as well as bruises on her arm, back, sides, and foot. Photographs of D.V. taken by VA police officers right after the altercation revealed no scratches on her chest. But photographs taken four hours later showed obvious scratches. D.V. told police that Chapman had inflicted those scratches.

3

The United States initially charged Chapman under the ACA with two state

misdemeanor offenses—aggravated battery against a household member, in violation

of N.M. Stat. §§ 30-3-16(B) and 31-19-1(A), and interference with communications,

in violation of N.M. Stat. §§ 30-12-1(D) and 31-19-1(A)—as well as the federal

offense of possessing a firearm on VA property, in violation of 38 C.F.R.

§ 1.218(a)(13). The two New Mexico misdemeanor charges were offenses

assimilated into the federal code because they occurred on VA property. See 18

U.S.C. § 13. The Government later dismissed the third count, and tried the remaining

two assimilated charges to a jury. The jury convicted Chapman of aggravated battery

of a household member, but acquitted him of the interference-with-communications

offense. The district court determined that its sentencing options for the aggravated

battery conviction were limited to those provided by state law and sentenced

Chapman to the maximum one-year term of probation provided by New Mexico law

and the state's maximum fine of $1,000.[1]

## II. DISCUSSION

### A. The district court did not abuse its discretion in admitting Nurse Starr's expert testimony

Prior to trial, the defense pointed out to the Government that in the photos

taken of D.V. right after the altercation, there were no scratches on her chest, but in

---

[1] On appeal, the parties agree that they incorrectly informed the district court at sentencing that the maximum term of probation provided by New Mexico law was one year when, in fact, New Mexico provided up to two years' probation. The Government does not challenge that error on appeal.

4

photos taken four hours later, there were obvious scratches.  When prosecutors asked

D.V. about the scratches, she stated that she must have caused them.

Nine days before trial was set to begin, the Government notified Chapman, see

Fed. R. Crim. P. 16(a)(1)(G), that it intended to offer expert testimony from Gail

Starr, a certified sexual assault nurse examiner, that, in her experience, victims of

sexual assault or domestic violence often injure themselves as a mechanism to cope

with trauma when the victim's usual coping mechanisms are unavailable.  Chapman

objected to Starr giving this testimony and asked for a Daubert[2] hearing.  The court

held a hearing the next day (one week before trial was scheduled to begin); during

that hearing the district court heard the Government's proffer as to what Nurse

Starr's testimony would be (Starr herself was not available at that time).

The court then ruled that Nurse Starr could not testify about a condition called

non-suicidal self-injury, because that condition applies only when an individual has

self-inflicted injuries on at least five occasions during a year's time and there was no

indication that D.V. had ever previously injured herself.  But the court held that

Nurse Starr could testify that a single trauma could be so severe that a person could

injure herself once, as a coping mechanism to deal with that trauma.  The court then

granted Chapman's request for a thirty-day continuance so that the defense could

obtain its own expert to challenge or rebut Starr's testimony.  The defense obtained

an expert, but did not present his testimony at trial.  Chapman renewed his objection

---

[2] Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

to Starr's testimony, both just prior to and at trial. The court overruled each of those objections.

During trial, D.V. testified that originally she thought that Chapman had scratched her chest during the altercation but acknowledged that, because the scratches were present only in the later photos, "they had to be self-inflicted." (IV R. 480.) Nevertheless, she did not remember when or why she scratched herself. On cross-examination, D.V. admitted that when she spoke with police after the altercation, she told them Chapman had scratched her chest because "I did not know that I had caused those scratches." (Id. 506.) Through cross-examination, the defense suggested that D.V. had scratched herself to fabricate evidence against Chapman.

Nurse Starr then testified to the following: In her experience, it was "fairly normal" for people involved in trauma or under great stress to cause injury to themselves, and not to recall having done so. (Id. 538.) The self-injury could "be a one-time deal," "a way of coping with a lot of stress, hopelessness, depression," "a coping mechanism, a way of calming yourself down, making yourself feel better. It's not a healthy one." (Id. 542.) Starr further cited and discussed articles that supported her testimony. In Starr's opinion, D.V.'s actions in scratching herself were consistent with being a victim of domestic violence. Starr, however, further testified that, although she had seen the photographs of D.V. and read the police reports of the altercation, Starr had never met D.V., had not evaluated her, nor could Starr testify as to what actually happened between Chapman and D.V. According to Starr, there are

6

many reasons why someone might injure herself, including using self-inflicted injuries to accuse someone falsely of domestic violence. Starr had no idea why D.V. had scratched herself.

At the conclusion of trial, the district court, without objection from the parties, instructed the jurors:

> During the trial you heard the testimony of a government expert, who expressed opinions concerning possible reasons persons inflict injuries on themselves. In some cases, such as this one, scientific, technical, or other specialized knowledge may assist the jury in understanding the evidence or in determining a fact in issue. A witness who has knowledge, skill, experience, training or education, may testify and state an opinion concerning such matters.
>
> You are not required to accept such an opinion. You should consider opinion testimony just as you consider other testimony in this trial. Give opinion testimony as much weight as you think it deserves, considering the education and experience of the witness, the soundness of the reasons given for the opinion, and other evidence in the trial.

(I R. 245.)

On appeal, Chapman challenges the district court's decision to admit Nurse Starr's testimony on several grounds.

**1. The district court did not abuse its discretion in determining that Nurse Starr's testimony was admissible under Fed. R. Evid. 702**

The district court permitted Nurse Starr to testify as an expert under Fed. R. Evid. 702. Where, as here, the district court applied the proper Rule 702 standard, we review the court's decision to admit Nurse Starr's expert testimony for an abuse of discretion. See United States v. Medina-Copete, 757 F.3d 1092, 1100 (10th Cir. 2014). The district court abuses its discretion if the court's decision "is arbitrary,

7

capricious, whimsical or manifestly unreasonable, or when we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Id. at 1100-01 (internal quotation marks omitted).

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of this case.

Fed. R. Evid. 702. Rule 702 requires the district court, before admitting expert testimony, to ensure that testimony 1) has "a reliable basis in the knowledge and experience of [the expert's] discipline," and 2) is "relevant to the task at hand." Daubert, 509 U.S at 592, 597; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999) (holding Daubert's inquiry "applies to all expert testimony"). Applying this two-part inquiry, the district court did not abuse its discretion in permitting Nurse Starr's testimony.[3]

---

[3] An initial question under Rule 702 is whether the proffered expert is qualified to testify on the topic for which her testimony is offered. See Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . ."); see also

8

### a. Reliability

In determining whether proffered expert testimony is reliable, Rule 702(d) directs the district court to consider 1) whether "the testimony is based on sufficient facts or data"; 2) whether it "is the product of reliable principles and methods"; and 3) whether "the expert has reliably applied the principles and methods to the facts of this case." Fed. R. Evid. 702(b)-(d).  On appeal, Chapman asserts that Starr's testimony was not reliable because she never met D.V., nor did Starr ever examine or evaluate her.  We reject this argument. "An expert may base an opinion on facts or data in the case that the expert has been made aware of <u>or</u> personally observed."  Fed. R. Evid. 703 (emphasis added).  "Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.  See Rules 702 and 703."  <u>Daubert</u>, 509 U.S. at 592; see <u>United States v. Lauder</u>, 409 F.3d 1254, 1264 & n.5 (10th Cir. 2005) ("<u>Daubert</u> generally does not . . . regulate the underlying facts or data that an expert relies on when forming her opinion.").

---

<u>United States v. Nacchio</u>, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc).  In this case, the district court determined that "Starr is qualified to testify about self-harm and self-injury, and how it arises in the context of traumatic stress and domestic abuse."  (I R. 184.)  Chapman does not challenge that determination on appeal.  The record indicates, among other things, that Starr had been a certified sexual assault nurse examiner for seven years, had seen over 400 patients during that time, also dealt with domestic violence while working in trauma units for ten years; and, prior to becoming a nurse, worked as a mental health tech for seven years with patients "having an acute crisis" (IV R. 526-27).

9

Moreover, during her testimony, Nurse Starr acknowledged that she had not personally evaluated D.V. and opined only that D.V's scratching herself was <u>consistent</u> <u>with</u> conduct exhibited by victims of domestic violence and sexual assault as a mechanism to cope with their stress. Nurse Starr did not testify that D.V. was a victim of domestic violence nor that that was the reason she scratched herself. <u>Cf.</u> <u>United States v. Charley</u>, 189 F.3d 1251, 1256, 1264 (10th Cir. 1999) (upholding admission of opinion of expert who had interviewed purported child victims "that the evidence is consistent or inconsistent with the victim's allegations of child abuse, and allowing [the expert] to inform the jury of characteristics in sexually abused children and describe the characteristics the alleged victim exhibits") (internal quotation marks omitted).

### b. Relevance

Rule 702(a) provides that expert testimony may be admissible if it "will help the trier of fact to understand the evidence or determine a fact in issue." "This condition goes primarily to relevance." <u>Daubert</u>, 509 U.S. at 591. "'Relevant evidence' is defined as that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" <u>Id.</u> at 587 (quoting Fed. R. Evid. 401). In this case, the district court did not abuse its discretion in holding that Starr's testimony—"that victims of domestic abuse engage in self-injury as a coping mechanism and that [D.V's] actions are consistent with this phenomenon"—was

10

relevant to a material question in this case: "why [D.V.] scratched herself[.]" (I R. 187.)

Chapman challenges the district court's ruling, arguing that, because it is undisputed that D.V. scratched herself <u>after</u> the altercation, Nurse Starr's testimony about why victims of domestic abuse might injure themselves did not bear on a material fact. But whether D.V. acted consistently with being a domestic violence victim was material to the critical question at issue at trial of whether she or Chapman was the aggressor during their altercation. Moreover, Chapman made the question of why D.V. scratched herself a material fact by arguing that D.V. had scratched herself in order to fabricate evidence against Chapman, perhaps trying to cover up that she was the aggressor instead of him. Thus, Nurse Starr's opinion that D.V.'s conduct in scratching herself after the altercation was consistent with her being a victim of domestic violence was relevant because it bore on material facts disputed at trial.

Chapman further contends that Nurse Starr's testimony was not relevant because the Government sought to use it to bolster D.V.'s credibility, and expert testimony regarding a witness's credibility is not appropriate. <u>See</u> <u>Charley</u>, 189 F.3d at 1267 ("In general, expert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702."). The district court did not abuse its discretion in rejecting this argument. In permitting Nurse Starr to testify, the district court ruled that she

11

could not testify that D.V. was telling the truth, nor that D.V. was not the aggressor, but only that D.V.'s conduct in scratching herself was consistent with that of a domestic abuse victim using self-injury as a coping mechanism. As the district court noted, such testimony did not directly bolster D.V.'s explanation of why she scratched herself because D.V. testified that "[s]he does not know why she scratched herself." (I R. 188.)[4]

### c. Manner in which district court conducted Rule 702 analysis

Before admitting expert testimony, the district court must conduct Rule 702's analysis and, if the opposing party raised an objection, the district court "must adequately demonstrate by specific findings on the record that it has performed its" Rule 702 gatekeeping obligations. United States v. Avitia-Guillen, 680 F.3d 1253, 1256 (10th Cir. 2012) (internal quotation marks omitted). But the manner in which the court conducts its Rule 702 analysis is left to the court's sound discretion. See id. "Tenth Circuit case law does not mandate that a hearing be held." United States v. Nacchio, 555 F.3d 1234, 1251, 1253-54 (10th Cir. 2009) (en banc). In this case, the trial court did conduct a hearing, but the expert was not available to testify or be cross-examined. Chapman contends that the district court abused its discretion in ruling that part of Nurse Starr's expert testimony was admissible without having Starr available for questioning. We disagree.

---

[4] On appeal, Chapman also asserts, in a conclusory manner, that the district court abused its discretion in permitting Nurse Starr to testify as to an ultimate issue of fact. "We need not address unsupported, conclusory arguments." Az. Pub. Serv. Co. v. EPA, 562 F.3d 1116, 1130 (10th Cir. 2009). In any event, that argument lacks merit.

12

The Government gave notice of its intent to present Nurse Starr's expert testimony just a few days before trial was set to begin. Under those circumstances, the district court did not abuse its discretion in holding a hearing and relying on the Government's proffer of what Starr's testimony would be. Based on that proffer, the court ruled that Starr could testify, but the court did so without prejudice to Chapman later challenging her testimony again, after Chapman had more time to research Starr's opinion and to obtain an expert witness of his own. The court further ruled that, should Nurse Starr offer testimony that differed from the Government's pretrial proffer, the court would reconsider whether Starr could testify. Chapman never presented the court with any further information challenging the admissibility of Nurse Starr's testimony, and Starr testified at trial consistent with the Government's pretrial proffer of her opinion. Furthermore, Chapman has not shown how he could have better developed his Daubert challenge to Starr's testimony if Chapman had had an earlier opportunity to question Starr. See United States v. Allen, 603 F.3d 1202, 1212 (10th Cir. 2010). We cannot conclude, therefore, that the district court abused its discretion in initially ruling that Nurse Starr could testify without hearing her testimony at the pretrial Daubert hearing.

**2. The district court did not abuse its discretion in admitting Nurse Starr's testimony under Fed. R. Evid. 403**

Chapman next contends that, even if Nurse Starr's testimony was admissible under Rule 702, the district court abused its discretion in admitting her testimony

13

because its "probative value" was "substantially outweighed by a danger of . . . unfair prejudice" or "confusing the issues," Fed. R. Evid. 403.[5] We disagree.

The Tenth Circuit affords district courts "considerable discretion in performing Rule 403's balancing test." United States v. Tenorio, 809 F.3d 1126, 1130 (10th Cir. 2015). Here, as discussed above, Starr's testimony had significant probative value. The likelihood of Starr's testimony confusing the jurors was minimal. So, too, was the possibility of "unfair prejudice," meaning "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one," United States v. Rodella, 804 F.3d 1317, 1334 (10th Cir. 2015), petition for cert. filed, (U.S. Mar. 16, 2016) (No. 15-1158). Further, the trial court ameliorated any unfair prejudice or confusion by instructing jurors that they were not required to accept Nurse Starr's testimony, but should treat it as any other testimony and give it only the weight jurors thought it deserved. Furthermore, the jury acquitted Chapman of one of the two charged offenses, suggesting Starr's testimony did not unfairly prejudice Chapman. See United States v. Leonard, 439 F.3d 648, 652 (10th Cir. 2006) (finding no unfair prejudice where jury convicted defendant on one of the charges).

### 3. Conclusion as to Nurse Starr's expert testimony

For the foregoing reasons, the district court did not abuse its discretion in admitting Nurse Starr's expert testimony.

---

[5] Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

14

**B. The district court did not err in using state, rather than federal, law to determine the maximum term of probation and the maximum fine available**

The Assimilative Crimes Act ("ACA") provides, in pertinent part, that

> [w]hoever . . . is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted in the jurisdiction of the State, Territory, or District in which such place is situated, by the laws therein in force at the time of such act or omission, shall be guilty of a like offense and subject to <u>like punishment</u>.

18 U.S.C. § 13 (emphasis added).

> The purpose of the Assimilative Crimes Act is to provide a method of punishing a crime committed on government reservations in the way and to the extent that it would have been punishable if committed within the surrounding jurisdiction. The Act fills in gaps in federal criminal law by providing a set of criminal laws for federal enclaves.

<u>United States v. Garcia</u>, 893 F.2d 250, 253 (10th Cir. 1989) (internal quotation marks omitted).

At sentencing in this case, the district court ruled that the ACA required that New Mexico, rather than federal, law provided the available range of probation and fines. In light of that, the district court sentenced Chapman to what the parties represented to the court as the maximum term of probation permitted under New Mexico law—one year—even though federal law provides for up to five years' probation for a misdemeanor, <u>see</u> 18 U.S.C. §§ 3559(a), 3561(c)(2). The district court also imposed the maximum available fine under state law—$1,000, <u>see</u> N.M. Stat. § 31-19-1(A)—even though federal law permitted a fine of up to $100,000, <u>see</u> 18 U.S.C. § 3571(b)(5).

15

**1. The district court's decision to use state law was consistent with the ACA's language and purpose**

Reviewing de novo, see United States v. Gaskell, 134 F.3d 1039, 1041 (11th Cir. 1998), we affirm the district court's use of state law to determine Chapman's term of probation and fine. The ACA's language expressly requires that a federal offender receive a punishment "like" that available under state law for the same offense. See 18 U.S.C. § 13(a). In light of that, federal circuits have unanimously concluded that state statutes set the maximum and minimum range of imprisonment available for an ACA offense. See United States v. Martinez, 274 F.3d 897, 906 & n.12 (5th Cir. 2001) (citing, e.g., Garcia, 893 F.2d at 254 (10th Cir.)). Like imprisonment, both probation and a fine are "punishments." See United States v. Bryant, 136 S. Ct. 1954, 1962 (2016) (referring to a fine as noncustodial punishment); United States v. Knights, 534 U.S. 112, 119 (2001) (referring to probation as punishment). See generally United States v. Mayberry, 774 F.2d 1018, 1020-21 (10th Cir. 1985) (giving "punishment" under the ACA "a broad and inclusive meaning").

The ACA's language does not suggest that a sentencing court should treat differing forms of punishment differently. Instead, we read the ACA to take a holistic approach, requiring federal courts to look to state law to determine the range of different forms of punishment available when sentencing an ACA offender. Doing so serves the ACA's purpose, "to provide a method of punishing a crime committed on government reservations in the way and to the extent that it would have been

16

punishable if committed within the surrounding jurisdiction," Garcia, 893 F.2d at 253

(internal quotation marks omitted).  We, therefore, affirm the district court's decision

to use the probation and fine ranges provided by New Mexico law to sentence

Chapman.  See United States v. Harris, 27 F.3d 111, 116 (4th Cir. 1994) (applying

state, rather than federal, law to determine fine available for an ACA offense).

### 2.  18 U.S.C. § 3551(a) does not require a different result

18 U.S.C. § 3551(a) provides, in pertinent part, that

> [e]xcept as otherwise specifically provided, a defendant who has been
> found guilty of an offense described in any Federal statute, including
> sections 13 [the Assimilative Crimes Act] and 1153 [addressing
> offenses committed in Indian country] of this title . . . shall be sentenced
> in accordance with the provisions of this chapter so as to achieve the
> purposes set forth in subparagraphs (A) through (D) of section
> 3553(a)(2) to the extent that they are applicable in light of all the
> circumstances of the case.

(Emphasis added.)  The purposes set forth in § 3553(a)(2) include the need for a

sentence

> (A) to reflect the seriousness of the offense, to promote respect for the
> law, and to provide just punishment for the offense; (B) to afford
> adequate deterrence to criminal conduct; (C) to protect the public from
> further crimes of the defendant; and (D) to provide the defendant with
> needed educational or vocational training, medical care, or other
> correctional treatment in the most effective manner[.]

The Government contends that § 3551(a) requires sentencing courts to apply

federal rather than state statutes to determine an ACA offender's probation and fine

ranges.  More specifically, the Government asserts: State law establishes the

maximum and minimum terms of imprisonment available for an ACA offense.  Based

on that range of imprisonment, the federal sentencing court must then classify the

17

offense of conviction, under 18 U.S.C. § 3559(a), as either an infraction, petty offense, misdemeanor, or felony, and determine the appropriate degree of misdemeanor or felony. The federal sentencing court must then use that federal classification to establish the available ranges for probation and fines under <u>federal</u> law.

There is no language in either the ACA or § 3551(a) to support the Government's argument for such a mechanism to determine the available range of probation and fines for an ACA offender. In <u>Garcia</u>, this court read § 3551(a) together with the ACA to hold that state law sets the maximum and minimum terms of imprisonment, as the ACA requires, and then § 3551(a) requires the sentencing court to apply the federal sentencing guidelines to impose a sentence within the range set by state law. 893 F.2d at 253-54.[6] But there is no directive that § 3551(a) further requires a court sentencing an ACA offender to look to federal, rather than state law, to impose a fine or probation.

---

[6] The previous version of § 3551(a) at issue in <u>Garcia</u> did not expressly refer to the ACA, as does the current version of § 3551(a), but instead applied to "a defendant who has been found guilty of an offense described in any Federal statute." 893 F.2d at 253 (applying 18 U.S.C. § 3551(a) (1988)); <u>see</u> <u>United States v. Thomas</u>, 68 F.3d 392, 394 (10th Cir. 1995). But Congress's 1990 amendment of § 3551(a) to add an express reference to the ACA—"a defendant who has been found guilty of an offense described in any Federal statute, including <u>sections 13</u> and 1153 of this title" (emphasis added)—merely clarified what we had already held in <u>Garcia</u>, that a federal sentencing court should apply federal sentencing guidelines to impose punishment for an ACA offense within the maximum and minimum ranges of imprisonment established by state law. <u>See</u> <u>Thomas</u>, 68 F.3d at 394; <u>United States v. Nelson</u>, No. 98-2102, 1998 WL 658393, at *2 n.5 (10th Cir. Sept. 15, 1998) (unpublished).

**3. Applying state law to set the range for probation and fines is not contrary to federal sentencing policy**

A federal sentencing court will decline to apply state law to sentence an ACA offender if doing so violates federal penal policy. See United States v. Christie, 717 F.3d 1156, 1172 (10th Cir. 2013). This court has previously applied this rule—an exception to the ACA's mandate to impose a punishment "like" that available for the same offense under state law—to sentencing provisions that conflict with explicit federal law.

> [F]or example, we do not require district courts to follow state parole policies given Congress's express abolition of parole in the federal system. See United States v. Pinto, 755 F.2d 150, 154 (10th Cir. 1985). Neither may federal courts ignore congressionally mandated sentencing guidelines in favor of state sentencing guidelines. See Garcia, 893 F.2d at 254. And federal courts cannot impose the death penalty relying on state law when doing so would upset Congress's judgment about when capital punishment is and is not warranted. See Lewis[v. United States], 523 U.S. [155,] 170 [(1998)].

Christie, 717 F.3d at 1172; see also United States v. Sain, 795 F.2d 888, 890-91 (10th Cir. 1986) (holding federal court was not required to provide jury trial for ACA offense when federal law did not permit it, but state law did).

Here, on appeal, the Government vaguely suggests that the district court's decision to look to state law to set the range for probation and fines was contrary to federal penal policy. But the Government fails to identify any such federal penal policy, and we can find none.

The Eleventh Circuit has held that, under the circumstances presented in United States v. Gaskell, "federal judges sentencing under the ACA may exceed the

19

state statutory maximum term for a sentence of probation when necessary to effectuate the policies behind the federal probation statutes, 18 U.S.C. §§ 3561-66." 134 F.3d at 1040. In reaching that conclusion, the Eleventh Circuit relied on cases declining to apply state parole laws to an ACA offender because those state laws contradicted the federal penal policy abolishing parole; those cases instead imposed a term of federal supervised release on ACA offenders, in lieu of parole. Id. at 1043-44.[7]

Unlike parole, however, the federal penal system has not abolished probation. In fact, both federal and state law provides for a term of probation for Chapman's offense, as well as the imposition of a fine. So, unlike imposing parole contrary to the federal system's abolition of parole, imposing probation or a fine does not directly contradict any federal penal policy, at least none that the Government identifies. In summary, we decline to follow Gaskell and hold, instead, that with the Assimilative Crimes Act, a federal sentencing court imposing a fine and probation is limited to any state limits applicable to the crime of conviction.

For these reasons, then, we affirm the district court's use of New Mexico law to impose a term of probation and a fine because doing so was consistent with the

---

[7] The analogy the Eleventh Circuit drew between parole, supervised release, and probation is not perfect. Parole, like supervised release, provides for post-incarceration supervision. But probation is often imposed instead of incarceration, and therefore is arguably more analogous to a term of imprisonment. As previously mentioned, federal circuits have unanimously concluded that state statutes set the maximum and minimum range of imprisonment available for an ACA offense. See Martinez, 274 F.3d at 906 (5th Cir.); see also Garcia, 893 F.2d at 254 (10th Cir.).

20

ACA's requirement that the punishment for a federal ACA offense be "like" the state punishment for that same offense.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM Chapman's conviction and sentence.