An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 24-420

Filed 5 November 2025

Wake County, Nos. 20CR218652-910, 20CR219573-910

STATE OF NORTH CAROLINA

v.

CARLOS JOSE JACOME, Defendant.

Appeal by defendant from order entered 27 July 2023 by Judge Paul C. Ridgeway in Wake County Superior Court. Heard in the Court of Appeals 10 June 2025.

> *Attorney General Jeff Jackson, by Special Deputy Attorney Generals Marissa K. Jensen and Robert C. Ennis, for the State.*
>
> *Janine Fodor for defendant-appellant.*

DILLON, Chief Judge.

Defendant Carlos Jacome seeks review of a judgment entered by the trial court upon a jury's verdict convicting him of first-degree murder for the death of Emily Montgomery and for the dismemberment of her remains. For the reasoning below, we conclude Defendant received a fair trial, free of reversible error.

## I. Background

### A. Defendant and Emily's Relationship

The evidence at trial tended to show the following: Emily Montgomery, her mother, and Emily's son moved to Apex in 2016.

Emily met Defendant through a mutual friend and began dating him in May of 2020. After dating for a short period of time, their relationship was defined as "toxic" and "messy" by Emily's family and friends. On multiple occasions Emily told her friends and mother that Defendant choked her, hit her, and gave her a black eye over the course of multiple conflicts.

On 9 September 2020, Defendant called Emily's mother to come pick her up from his apartment. When Emily's mother went to pick her up, she found Emily in the bedroom naked with bruises all over her body and a black eye, intoxicated and unable to speak coherently. From that day through 26 November 2020, Emily spent approximately seventy percent of her time at Defendant's house.

On Thanksgiving Day, 26 November 2020, Emily texted a friend and told her "[i]t's going to happen. He's gonna kill me first." Emily's mother did not speak to Emily on Thanksgiving despite two attempts to contact her via text message and a phone call. The following day, Defendant called Emily's mother to inform her that they had gone to his parents' house for Thanksgiving, Emily stayed in the car when they arrived rather than going inside with him, and she had disappeared when he

returned to his car. Following this conversation, Emily's mother went to the Apex Police Department and reported Emily missing.

## B. Investigation

A detective met with Defendant on 28 November 2020 to ask him about Emily's disappearance. Defendant told the detective that he and Emily went to his parents' house but she did not go in the house because she "had not had her hair done." Defendant stated once he went back outside to leave his parents' house Emily was no longer in the car and he did not see her after that point.

The next day, on 30 November 2020, the detective obtained Emily's phone records. The records showed that on Thanksgiving Day (26 November 2020) Emily's phone left Defendant's parents' home and traveled southbound towards Emily's mother's home in Apex. After remaining in that area for a few minutes, her phone traveled near WakeMed in Cary. Her phone was turned off at 11:56 p.m. and did not turn back on until 7:08 a.m. near Salem Street and Tingen Road in Apex.

Law enforcement obtained toll records from Highway 540 showing Defendant's car traveling south on Thanksgiving Day. This evidence contradicted Defendant's statement to the detective that he returned home after going to his parents' house. The detective obtained Defendant's phone records which showed Defendant's phone and Emily's phone traveled together from Defendant's parents' house to Apex and later to Cary near WakeMed. After Emily's phone turned off, Defendant's phone traveled back to his home. On 3 December 2020, after law enforcement conducted

additional investigation, Defendant was arrested for Emily's murder.

In addition to the cellphone location records, law enforcement also conducted a forensic extraction of Defendant's cellphone using a program called Cellbrite. The Cellbrite extraction showed three searches were made from Defendant's phone on 28 November 2020. At 12:36 a.m. the phrase "body chopped in pieces" was searched on Defendant's phone. At 3:54 a.m. the phrase "what time is sunrise in Raleigh, NC" was searched on Defendant's phone. Finally, at 12:59 p.m., the phrase "how long for a body to decompose in dirt" was searched on Defendant's phone.

Further investigation showed that Defendant purchased two car washes on 27 November 2020. Defendant additionally purchased a shovel, drain opener, shower liner, trash bags, Arm & Hamer Oxi-Fresh, four bottles of bleach, trash bags, and a comforter set over the span of three trips to Walmart.

Law enforcement also examined Defendant's vehicle and apartment to search for the presence of blood. Traces of blood were found in several places in both Defendant's vehicle and apartment, but law enforcement only determined that Emily's DNA was found in a swab from the foam piece from the driver's seat cushion and the floor mat of the vehicle.

## C. Trial

At trial, Special Agent Putnam, a member of the FBI cellular analysis survey team ("CAST"), was accepted as an expert witness in cellular record analysis. Based on his expert report, Putnam testified that Defendant's and Emily's phones were

together the night of her disappearance and Defendant visited Emily's gravesite multiple times in the days following her disappearance. The trial court also accepted Sergeant Melissa Ottaway as an expert witness and allowed her to testify, based on her experience and training, as to whether she noted "red flags" or "symptoms or characteristics that are consistent with domestic violence" in the relationship.

The State also brought Brittnay Pierce in to testify about her previous relationship with Defendant. Pierce testified regarding their "toxic" and abusive relationship in the years prior to Defendant and Emily's relationship, and she recounted multiple specific instances of domestic violence.

The jury ultimately found Defendant guilty of first-degree murder for the death of Emily Montgomery and for the dismemberment of her remains. Defendant gave oral notice of appeal.

## II. Analysis

Defendant raises five issues on appeal. We will address each in turn.

### A. Expert Testimony

Defendant contends the trial court erred by allowing Sergeant Melissa Ottaway to testify as an expert witness on domestic violence. Defendant argues that her testimony did not meet the reliability standard set in Rule 702 of the North Carolina Rules of Evidence and thus should have been excluded. Defense counsel filed a Motion in Limine objecting to the admission of Sergeant Ottaway's testimony, and renewed the objection before she testified to the jury.

A trial court's ruling regarding whether the proffered expert witness testimony meets Rule 702(a) requirements "will not be reversed on appeal absent a showing of abuse of discretion." *State v. McGrady*, 368 N.C. 880, 893 (2016) (citation omitted). "A trial court may be reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision." *State v. Riddick*, 315 N.C. 749, 756 (1986). "A finding by the trial judge that the witness possesses the requisite skill will not be reversed on appeal unless there is no evidence to support it." *State v. Bullard*, 312 N.C. 129, 140 (1984) (citation omitted). Additionally, "evidentiary error does not necessitate a new trial unless the erroneous admission was prejudicial." *State v. Wilkerson*, 363 N.C. 382, 415 (2009) (citation omitted). An evidentiary error is prejudicial "when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A–1443(a). "The burden of showing such prejudice under [subsection 15A–1443(a)] is upon the defendant." *Id.*

Here, based on the additional evidence and testimony, we hold that even if the expert witness's testimony was in violation of Rule 702(a), the error was not prejudicial. Defendant failed to meet the burden of proof to demonstrate that had the alleged error not occurred, it is likely the jury would have reached a different conclusion. While the jury heard testimony regarding the likelihood that Defendant and Emily were in an abusive relationship, Defendant failed to provide an argument

as to how this testimony, when taken into consideration with the rest of the testimony and evidence, impacted the jury's decision.

### B. Testimony regarding prior misconduct

Next, Defendant contends that the trial court erred by allowing Brittnay Pierce to testify regarding their prior relationship. Defendant argues that the testimony from Pierce violated N.C.G.S. § 8C-1, Rule 404(b) because the only probative value from her testimony was to denigrate Defendant's character.

Our Supreme Court has stated that:

> when analyzing rulings applying Rules 404(b) and 403, we conduct distinct inquiries with different standards of review. When the trial court has made findings of fact and conclusions of law to support its 404(b) ruling, as it did here, we look to whether the evidence supports the findings and whether the findings support the conclusions. We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b). We then review the trial court's Rule 403 determination for abuse of discretion.

*State v. Beckelheimer*, 366 N.C. 127, 130 (2012). Because Defendant fails to make an argument regarding Rule 403, we only analyze this issue to determine whether the evidence supports the findings and conclusions of law.

Rule 404(b) lists numerous acceptable reasons to admit evidence of prior crimes or acts, including to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." Rule 404(b). However, this list "is not exclusive, and such evidence is admissible as long as it is

relevant to any fact or issue other than the defendant's propensity to commit the crime." *State v. White*, 340 N.C. 264, 284 (1995) (citation omitted). Additionally,

> [t]hough it is a rule of inclusion, Rule 404(b) is still constrained by the requirements of similarity and temporal proximity. Prior acts are sufficiently similar if there are some unusual facts present in both crimes that would indicate that the same person committed them. We do not require that the similarities rise to the level of the unique and bizarre.

*Beckelheimer*, 366 N.C. at 131 (internal quotations omitted).

Here, there are multiple similarities between Pierce's relationship with Defendant and Emily's relationship with Defendant. These similarities include but are not limited to their relationships being defined as toxic, multiple incidents of choking both females, frequent arguments, and physical assault. Therefore, based on a de novo review of the record and evidence, we hold there was sufficient evidence to support the conclusion of law that the evidence was admissible under Rule 404(b).

### C. Motion to suppress for invalid search warrant

Next, Defendant contends the trial court erred in denying a motion to suppress evidence found on his cellphone. Defendant argues that the two search warrants ("2020 search warrant" and "2023 search warrant") for his cellphone were invalid and violated his Fourth Amendment constitutional right because the search warrants were too broad and failed to provide any particularity for the search.

When analyzing a decision on a motion to suppress

> [i]t is well established that the standard of review . . . is

that the trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting. In addition, findings of fact to which defendant failed to assign error are binding on appeal. Once this Court concludes that the trial court's findings of fact are supported by the evidence, then this Court's next task is to determine whether the trial court's conclusions of law are supported by the findings. The trial court's conclusions of law are reviewed *de novo* and must be legally correct.

*State v. Campbell*, 188 N.C. App. 701, 704 (2008) (citations, quotation marks, and brackets omitted).

The Fourth Amendment of the United States Constitution protects U.S. citizens from unreasonable searches and seizures and grants them a degree of privacy. "Under North Carolina law, an application for a search warrant must be supported by an affidavit detailing 'the facts and circumstances establishing probable cause to believe that the items are in the places . . . to be searched.'" *State v. McKinney*, 368 N.C. 161, 164 (2015) (quoting N.C.G.S. § 15A–244(3) (2013)). The particularity requirement is necessary to minimize the intrusion upon a citizen's privacy. *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (holding that a search warrant should be as limited as possible to avoid "exploratory rummaging in a person's belongings.)"

"A search warrant must particularly describe the place to be searched, as well as the activities and objects which are the subjects of the proposed search." *Brooks v. Taylor Tobacco Enterprises, Inc.*, 298 N.C. 759, 762 (1997) (internal quotations

omitted). While a search warrant needs to particularly describe the place to be searched, it "need only be reasonably specific, rather than elaborately detailed." *United States v. Mann*, 389 F. 3d 869, 877 (9th Cir. 2004). Although the law of what constitutes a permissible scope of a search warrant of cell phone data is not yet well established in North Carolina, we are persuaded by numerous federal cases which speak on this issue. For example, in *United States v. Otero*, the Court held that a search warrant permitting the search of "any and all" information was invalid. 563 F.3d 1127, 1132–23 (10th Cir. 2009). In contrast, a search warrant was found sufficient and valid when it limited the scope of the search to evidence and information pertaining to a specific crime. *See United States v. Riccardi*, 405 F.3d 852, 862 (10th Cir. 2005).

The case before us is most analogous to *United States v. Christie*, 717 F.3d 1156 (10th Cir. 2013). In *Christie*, the defendant argued that the search warrant was not valid because it failed to particularly describe the scope of the search. *Id*. at 1164. The language of the search warrant requested a search of "[a]ll records and information relating to the murder, neglect, and abuse of [child] from June 19, 2002 (date of birth) to May 4, 2006, (date computer seized), including . . . [a]ll correspondence and/or documents relating to [child]." *Id*. at 1165. In *Christie*, the Tenth Circuit Court held that the search warrant language provided sufficient particularity to limited the scope of the search of the defendant's computer. *Id*.

Here, the scope of the search is analogous to the scope of the search in *Christie*.

In *Christie*, the scope of the search was "all records and information relating to the [crime]" over a four-year time period. *Id.* at 1164. Here, the description of the item to be searched in the 2020 search warrant was "[Defendant's iPhone] and any attached storage devices, all data storage devices, both internal and external . . . relating to an investigation of a missing and endangered person." Both search warrants limit the scope of the search to only data, evidence, and information pertaining to one specific crime against one specific person. Because of the similarities in the search warrants, we hold that the 2020 search warrant passes the particularity test to be valid under the Fourth Amendment of the United States Constitution because the scope is limited to only evidence of a specific crime relating to a specific person. *See United States v. Riccardi,* 405 F.3d 852, 862 (10th Cir. 2005); *see also United States v. Campos*, 221 F.3d 1143, 1147 (10th Cir. 2000); *United States v. Burke*, 633 F.3d 984, 992 (10th Cir. 2011); *United States v. Brooks*, 427 F.3d 1246, 1252 (10th Cir. 2005).

Defendant also contends that the 2023 search warrant is invalid because the description of the scope of the search is identical to the description of the 2020 search warrant. We agree that the search warrants are identical, and for the reasoning stated above, we also hold that the 2023 search warrant passed the particularity test and thus was a valid search warrant under the Fourth Amendment.

D. Illegal search of cellphone location data

Fourth, Defendant contends that the trial court erred by admitting cell phone

site location information ("CSLI") at trial because it was obtained as the result of an illegal search.

Defendant failed to object to the admission of this evidence at trial, thus we review the issue for plain error. *State v. Lawrence*, 365 N.C. 506, 518 (2012). Under plain error review, Defendant "must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Roseboro,* 351 N.C. 536, 553 (2000) (citations omitted). A plain error review

> is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *'fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done,' or 'where [the error] is grave error which amounts to a denial of a fundamental right of the accused,' or the error has 'resulted in a miscarriage of justice [.]' (emphasis in original).

*State v. Odom*, 307 N.C. 655, 660 (1983) internal citations omitted.

Defendant points out flaws in the Stored Communications Act (SCA) Order used to support the warrant to obtain CLSI. The flaws in the SCA Order include grammatic errors (incorrectly stating Defendant was the subject of the missing and endangered person search), misrepresented content (claiming the admission of the text stating "he is going to kill me" was misleading because the text never stated Defendant was "he"), and omitting evidence (failing to state all the locations Emily's phone traveled the night of her disappearance). Defendant argues that because of

these flaws, the SCA Order was misleading and did not provide sufficient probable cause to obtain a search warrant of the CSLI.

However, Defendant failed to provide any argument to show that the alleged error of admitting the evidence derived from the CSLI and SCA Order was so fundamental, that absent its omission, the jury *probably* would have reached a different verdict. Therefore, based on the other evidence tending to show Defendant's guilt, the alleged error did not arise to the level of plain error.

### E. Violation of Confrontation Clause Rights

Finally, Defendant argues that the trial court erred by admitting cell phone location records into evidence under the business records exception. Defendant contends that this was a violation of his rights under the Confrontation Clause of the United States Constitution.

As in the last issue, Defendant failed to object to the admission of this evidence at trial and thus, we review the issue for plain error.

While Defendant makes arguments about how "critical" this evidence was for the State's case, he fails to provide any argument to show the alleged error was so fundamental that absent its omission, the jury probably would have reached a different verdict. Therefore, Defendant failed to meet the burden of showing plain error.

### III. Conclusion

For the foregoing reasons, we hold Defendant received a fair trial, free of

reversible error.

NO ERROR.

Judges CARPENTER and MURRY concur.

Report per Rule 30(e).